UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff*, v. ANTOWAN HAGANS, *Defendant*. | Criminal Action No. 25-00114 (AHA) |

### Memorandum Opinion and Order

Antowan Hagans was seized and ultimately arrested by Metropolitan Police Department ("MPD") officers on the stairs of his apartment building. The officers recovered a gun from the stairs, and Hagans has since been charged and indicted under the felon-in-possession statute. *See* 18 U.S.C. § 922(g)(1). Hagans moves to suppress the gun as the fruit of an unlawful seizure and arrest. After holding a suppression hearing and carefully considering all testimony and evidence, the Court concludes that the government has not met its burden to show reasonable suspicion for the seizure. The motion to suppress is granted.

**I.    Background**

On the night in question, MPD officers were patrolling the Lincoln Heights neighborhood in Northeast D.C. in four cars, three of which were not marked as police vehicles. Draft Hr'g Tr. at 21–26 (May 29, 2025). The officers wore plain clothes with outer vests saying "Police" in small lettering on the front and a large patch saying "Metropolitan Police" on the back. *Id.* at 23–24.

At about 9:00 p.m., the officers saw Hagans exiting an SUV parked outside an apartment building. Gov't Ex. 2B at 00:01–00:03; *see* Draft Hr'g Tr. at 75, 89–90. As one of the unmarked

cars approached Hagans's car, with another unmarked car following behind, the driver of the first car shined a flashlight at Hagans. Gov't Ex. 2B at 00:04; Gov't Ex. 4 at 21:03:57. Hagans swayed his head in response to the light. Gov't Ex. 2B at 00:04–00:05. As the car rolled next to Hagans's car, the driver said, "You good?" Gov't Ex. 3 at 21:04:01. Hagans closed his SUV door and, within one second, and as the first unmarked car was still rolling forward, four plain-clothed officers burst out of it. Gov't Ex. 2B at 00:09–00:12. Hagans ran away, toward the nearby apartment building, and the plain-clothed officers sprinted after him. *Id.* at 00:12–00:13. The second unmarked car then stopped and three more plain-clothed officers joined the chase. *Id.* at 00:13–00:19.

Hagans entered the building and began to run up a flight of stairs just inside the door. Gov't Ex. 4 at 21:04:09–21:04:11. At the same time, a woman, who turned out to be Hagans's mother, was walking down the stairs with a dog. *Id.* Hagans collided with his mother as several officers converged on the stairwell. *Id.* at 21:04:11–21:04:20; Gov't Ex. 5 at 21:04:11–21:04:20. The officers physically restrained Hagans on the stairs and recovered a gun that had fallen to the ground as Hagans and the officers collided with his mother. Gov't Ex. 6 at 21:04:11–21:04:22; *see* Draft Hr'g Tr. at 3, 8.

After Hagans was restrained, Hagans's mother told the officers that the gun belonged to her. Gov't Ex. 6 at 21:04:31; Gov't Ex. 3 at 21:06:07–21:06:17, 21:07:56. The officers were able to confirm on the scene that the firearm was registered to her and she had a license to carry it. Gov't Ex. 8 at 21:09:18–21:09:35; *see* ECF No. 25 at 16. The officers nonetheless arrested Hagans.

Hagans was charged and indicted for unlawful possession of a firearm under 18 U.S.C. § 922(g)(1). He moves to suppress the gun, challenging his seizure on the stairwell and the arrest after officers learned the weapon recovered was registered to his mother. ECF No. 20. The Court

2

held a suppression hearing and heard testimony from Sergeant Scott Possinger and Investigator Nicholas Damron, both of whom were present the night of the arrest.

**II.    Discussion**

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. Accordingly, "a police officer who seizes a person on less than probable cause 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts,' support 'a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" *United States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016) (internal citation omitted) (first quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968); and then quoting *Reid v. Georgia*, 448 U.S. 438, 440 (1980) (per curiam)). "It is the Government's burden to provide evidence sufficient to support reasonable suspicion justifying any such stop." *Id.* The court looks to the totality of the circumstances, considering only "the facts available to the officer at the moment of the seizure." *Id.* at 635 (quoting *Terry*, 392 U.S. at 21–22). The inquiry is an objective one: "'whether a reasonably prudent man in the circumstances would be warranted in his belief' that the suspect is breaking, or is about to break, the law." *Id.* (quoting *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001)).

The parties agree Hagans was seized when officers physically restrained him on the stairs. Draft Hr'g Tr. at 3, 8. The parties also agree that at the time the unmarked cars approached Hagans, he was standing next to a parked car and no officer had seen anything to suggest he was engaged in criminal activity. *See id.* at 96. The government argues the officers were nonetheless justified in seizing Hagans because (1) they were in a high crime neighborhood; (2) when the first unmarked car approached Hagans and the driver shined a light at him, Hagans made a "furtive movement"; and (3) Hagans ran when four people jumped out of the unmarked car. ECF No. 25 at 20–27. After hearing and evaluating the officers' testimony—including their accounts of the video footage—

and all evidence in the record, the Court concludes the government has not met its burden to show that the officers had a reasonable, articulable suspicion to seize Hagans.

The "lynchpin of any reasonable suspicion analysis in this case" must be the government's second and third factors. *Castle*, 825 F.3d at 636. As Supreme Court and D.C. Circuit case law instruct, the government's first factor, "the high crime nature of the neighborhood," is "not unimportant" but "is only a 'contextual consideration[]' and, as such, cannot provide the kind of information particular to [Hagans] that is necessary to demonstrate reasonable suspicion." *See id.* (alteration in original) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)); *see also Wardlow*, 528 U.S. at 124 ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."). The parties dispute whether crime statistics actually show that the seizure here took place in an area of the District that is higher in crime than others. *Compare* Draft Hr'g Tr. at 17 (Sergeant Possinger testifying that the neighborhood has "a high amount of violent crime," including firearm offenses), *and* Gov't Ex. 1 (crime card showing thirty-one "violent crimes with a gun" in relevant patrol area in six months prior to Hagans's arrest), *with* ECF No. 26-3 (crime card showing only four "violent crimes with a gun" in same timeframe within narrower sector of patrol area where Hagans was arrested). Ultimately, the Court finds this factor significantly less probative here than in other cases because, as Investigator Damron testified, the officers who observed Hagans had no indication he was engaged in any of the violent crimes that the government associates with the neighborhood. Draft Hr'g Tr. at 96 (agreeing that when officers observed Hagans, he was "alone next to a car" and "there was no indication he was committing a violent crime" or burglary, robbery, theft, or distribution of narcotics); *see also Edmonds*, 240 F.3d at 60 (holding that high crime neighborhood was probative where government showed "not just that [the neighborhood]

suffers from general, undifferentiated 'crime,' but that it is home to the precise type of infractions—drug and firearm offenses—that [the officer] suspected [the defendant] of committing").

The reasonable suspicion analysis therefore turns primarily on the government's reference to Hagans's "furtive movement" when the driver of the first unmarked car shined a light at him and the fact that Hagans ran when four people jumped out of the unmarked car. ECF No. 25 at 21–27; *see Castle*, 825 F.3d at 636. The difficulty for the government is that, on this record, one could not reasonably infer anything probative from Hagans's reactions because he would not have known the unmarked cars approaching him at night or the four people who burst out of the car were law enforcement. As the D.C. Circuit has explained, "furtive gestures 'are significant only if they were undertaken in response to police presence.'" *Castle*, 825 F.3d at 629 (quoting *United States v. Brown*, 334 F.3d 1161, 1168 (D.C. Cir. 2003)). And, of course, a person "can respond to the presence of a police officer only if he has recognized him as an officer." *Edmonds*, 240 F.3d at 137–38. An individual's "putatively evasive or furtive conduct cannot provide the necessary evidence of knowledge of a police presence." *Castle*, 825 F.3d at 629. "There must be independent evidence from which that knowledge can be inferred." *Id.*

As an initial matter, on this record, the Court finds the characterization of Hagans making a "furtive" movement itself is inadequately supported. The notion that Hagans made a furtive movement appears to originate from the *Gerstein* affidavit, which attested that officers saw Hagans "look towards the unmarked vehicles and immediately duck down as if he was attempting to hide." ECF No. 20-1 at 1.[1] The government's briefing also states that Hagans ducked to hide behind his

---

[1] The same affidavit attested that multiple officers who chased Hagans saw him "placing his right hand towards his front waistband area while his left arm was swinging freely." ECF No. 20-

5

car, citing an officer's body camera footage, *see* ECF No. 25 at 21–22, but the camera does not show Hagans making any movements at the time cited (or at any other point). *See* Gov't Ex. 3 at 21:04:00–21:04:05. However, surveillance footage from the apartment building does capture Hagans at the relevant time. That footage does not show Hagans duck behind his car; it shows Hagans move his head as a light is shined in his face, just as anyone might do if they encountered a high beam. Gov't Ex. 2B at 00:04–00:05. The Court cannot credit the government's proffer that this could have been seen as "evasive" or "unusual" in the circumstances. ECF No. 25 at 22. It would be unusual if someone did not react to a light shined in their eyes at night.

Even absent that finding, the Court finds no "evidence of knowledge of a police presence" from which one could then infer something probative about Hagans's moving in response to the light from the unmarked car or running as four people burst out of the car. *Castle*, 825 F.3d at 629. As the hearing testimony and video show, Hagans was standing inside his passenger door and getting something from his SUV as the cars were approaching. To the extent he even saw the first car approaching, it was unmarked and the car behind it was too. Similarly, to the extent Hagans could even see them, the officers who jumped out of the unmarked car once it was next to Hagans's SUV were in plain clothes. At no time before Hagans ran did the officers identify themselves as police. In such circumstances, there is nothing from which a reasonable officer could infer Hagans knew the people approaching him and exiting their cars were law enforcement.[2]

---

1 at 1. As the government has since conceded, the video footage shows otherwise: Hagans was swinging both arms as he ran. ECF No. 25 at 5 n.1; *see* Gov't Ex. 2B at 00:12–00:15. The pursuing officer who testified at the suppression hearing confirmed he never saw Hagans clutch his waistband. Draft Hr'g Tr. at 101.

2   The government briefly mentions a third, marked police car to support its argument that the officers reasonably believed Hagans was reacting to police presence. ECF No. 25 at 23. However, the marked car did not arrive on the scene until after Hagans had run, and there is no evidence indicating Hagans did see or could have seen the marked car. Gov't Ex. 2B at 00:21.

In its briefing and through testimony at the suppression hearing, the government asserted that knowledge of law enforcement presence could be inferred because residents commonly recognize the officers' unmarked cars as police vehicles. ECF No. 25 at 23. Sergeant Possinger testified generally that "the community has become incredibly familiar with our vehicles" and that "there are certain neighborhoods that use common phrases to let other members of the community know law enforcement is approaching." Draft Hr'g Tr. at 28. He added that the unmarked cars have "DC government license plates" that make it easy to identify them as government vehicles. *Id.* Investigator Damron similarly testified that unmarked vehicles are "very well known to most of the city" and highlighted "DC government tags" as an indicator. *Id.* at 74, 117. However, the Court does not find it credible that Hagans had an opportunity to recognize the cars approaching or decipher their license plates at night, from a distance, in the few seconds when the cars approached and the plain-clothed officers jumped out from the other side of his SUV. *See Castle*, 825 F.3d at 637 ("[T]here is little reason to suppose that the [unmarked police] truck's Florida license plates—the only arguably distinctive feature testified to by the officers—could be seen from any sort of distance, especially in the evening.").

In *Castle*, the D.C. Circuit reversed a district court that relied on similar testimony that officers "patrolled the area so regularly that people in the neighborhood had come to recognize their vehicle." *Id.* (citation and emphasis omitted). The court explained that "[t]he ability of neighborhood people to recognize the truck as a police vehicle cannot support an inference that [the defendant] had knowledge of the presence of that known police vehicle on the evening he was stopped." *Id.* at 629. In addition, as here, the government "'did not seek to qualify [the police officers] as . . . expert[s] on public identification of police vehicles' or 'establish a factual foundation for opinion testimony as [lay witnesses].'" *Id.* at 637 (alterations and omission in

7

original) (quoting *United States v. Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000)); *see also Johnson*, 212 F.3d at 1316 (stating that "we doubt very much" whether seizure would have been valid at earlier point in time because it was not clear defendant was aware that officer in unmarked car was law enforcement); *cf. Brown*, 334 F.3d at 1168 (finding sufficient basis for officers to believe they had been recognized where they were in uniform and patrol car was marked). The court further held that the district court erred by "equating the awareness of 'people in the neighborhood' that the unmarked truck the officers drove was a police vehicle with a determination that the officers could reasonably believe that [the defendant] was aware of the officers' truck on the evening in question." *Castle*, 825 F.3d at 637. As here, the government did not provide any evidence to support the inference that "the indicia of police presence (the truck) had come to the attention of [the defendant], let alone that [the defendant] reacted to the truck as a police vehicle." *Id.* at 637–38. As the D.C. Circuit reasoned, this circumstance is different from one in which "it could reasonably be inferred that the officers from whom [the defendant] fled were recognizable as police, that [the defendant] was aware of their presence, and that his flight was in response to that presence." *Id.* at 639 (citing *Wardlow*, 528 U.S. at 121–22); *see also Edmonds*, 240 F.3d at 138 (finding there was "no serious doubt that [the defendant] recognized Sergeant Feirson as an officer" where the officer had his police badge "prominently displayed on his chest" as he approached the defendant's van and saw the defendant through the windshield).

As one officer testified, if police investigating in unmarked cars and plain clothes want to make it known that they are law enforcement upon approaching someone at night, they typically announce it. Draft Hr'g Tr. at 64. Here, the officers did not. They rolled up to the other side of Hagans's SUV as he was standing next to it and said, "You good?"; then, when Hagans did not respond and closed his door, four people in plain clothes jumped out of the car. Any person might

reasonably have run in that circumstance, particularly given the prevalence of carjacking in the District. *See id.* at 15, 66, 69. It is, of course, police officers' decision whether circumstances call for concealing their presence or for identifying themselves so people know it is law enforcement approaching to make an inquiry. But when officers opt to conceal their presence and there is no basis to conclude the person approached knew otherwise, the government cannot later argue that person acted in response to the presence of law enforcement. In the absence of any basis to infer Hagans had knowledge of police presence, the Court cannot conclude the officers had a reasonable, articulable suspicion to seize him.

The government has not raised any alternative bases for the seizure. It concedes that if there was no reasonable suspicion, then suppression of the gun recovered is the appropriate remedy. *Id.* at 3.[3]

### III.   Conclusion

For these reasons, the Court grants Hagans's motion to suppress the fruits of the seizure. ECF No. 20.

_____
AMIR H. ALI
United States District Judge

Date:   July 31, 2025

---

[3] The Court need not reach Hagans's alternative argument that the officers lacked probable cause for the subsequent arrest based on the information they had, including confirmation that the gun was registered to his mother. ECF No. 20 at 14–15.